UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                       :

MEXICO INFRASTRUCTURE FINANCE, LLC,    :
                                         :

                          Plaintiff,    :      17cv6424 (DLC)
                                         :

                    -v-                 :      OPINION AND
                                         :        ORDER

THE CORPORATION OF HAMILTON and THE    :
BANK OF NEW YORK MELLON,              :

                          Defendants.   :
                                         :
--------------------------------------- X

APPEARANCES:

For plaintiff Mexico Infrastructure Finance, LLC:
Mark C. Zauderer
Grant A. Shehigian
Craig S. Kesch
Ganfer Shore Leeds & Zauderer LLP
360 Lexington Ave.
New York, NY 10017

For defendant the Corporation of Hamilton:
Kenneth I. Schacter
Simon Chang
Elizabeth Buechner
Morgan, Lewis & Bockius LLP
101 Park Ave.
New York, NY 10178

For defendant the Bank of New York Mellon:
Casey D. Laffey
Pamela Schoenberg
Hyuna Yong
Reed Smith LLP
599 Lexington Ave.
New York, NY 10022

DENISE COTE, District Judge:

This action arises out of a failed development project in Hamilton, the capital of Bermuda.  Nonparty Par-la-Ville Hotel and Residences Ltd. ("PLV") offered to build a mixed-use development on the site of a parking lot owned by the Corporation of Hamilton ("Hamilton" or the "Corporation"). Mexico Infrastructure Finance, LLC ("MIF" or the "Depositor") provided a short-term bridge loan for the project, and the Bank of New York Mellon ("BNYM" or the "Escrow Agent") served as the escrow agent for MIF's loan.  The project failed when nonparty Robert McKellar misappropriated the funds from MIF's bridge loan and absconded.

In this action, MIF brings claims against Hamilton and BNYM for their alleged breach in 2014 of the escrow agreement that governed the disbursement of MIF's bridge loan funds (the "Escrow Agreement").  According to MIF, Hamilton improperly authorized a disbursement of the funds, and BNYM improperly disbursed those funds.

This Opinion contains the Court's findings of fact and conclusions of law following a bench trial held on June 28, 2023.  For the following reasons, Hamilton is liable for breach of the Escrow Agreement; BNYM is not.

**Findings of Fact[1]**

The City of Hamilton (the "City") is the capital of Bermuda, a self-governing British territory.  The Corporation is a municipal corporation that governs the City's affairs. Hamilton owns a parking lot (the "Property") in the downtown area of the City.  MIF is a special-purpose vehicle created by Alsis Funds ("Alsis"), an investment company that provides real estate-backed loans and small-business loans.  PLV is a private development company that was run by its principal, Michael MacLean.  Finally, BNYM is a New York banking institution that served as the Escrow Agent for the bridge loan at issue in this case.

I.   The Development Agreement

On April 11, 2012, Hamilton, interested in developing the City's economy, entered into a commercial development agreement (the "Development Agreement") with PLV to build a mixed-use development consisting of a five-star hotel and associated amenities on the Property (the "Project").  Under the Development Agreement, Hamilton leased the Property to PLV, who, in turn, agreed to secure funding and develop the Project.

---

[1] The Court's findings of fact are primarily contained in this section but appear as well in the conclusions of law.

At least two sections of the Development Agreement are relevant to this action because they bear on Hamilton's role in the Project.  The first, § 13, required PLV to receive Hamilton's approval of certain financing documents for the Project.  It provided in part:

> 13.1    On or before expiry of the Financing Approval Period time being of the essence the Tenant [(PLV)] shall:
>
>> 13.1.1    present Financing to the Hotel Operator and obtain and deliver to the Landlord [(Hamilton)] the Hotel Operator Financing Confirmation Notice
>>
>> 13.2.2    supply Financier details to the Bermuda Monetary Authority and the Landlord and
>>
>> 13.3.3    obtain and deliver to the Landlord unequivocal written approval of the Financier from the Bermuda Monetary Authority (or some other independent body nominated by the Government of Bermuda) in which event approval of the Landlord of the Financier shall not be required.

If PLV failed, before the end of the Financing Approval Period, to deliver to Hamilton the Hotel Operator Financing Confirmation Notice or to obtain the approval of the Bermuda Monetary Authority, Hamilton could terminate the Development Agreement and the associated lease.[2]

---

[2] Before the loan transaction closed, PLV and Hamilton entered into a Deed of Variation of Development Agreement dated March 28, 2014 (the "Deed of Variation").  The Deed of Variation deleted § 13 of the Development Agreement since Hamilton

The second relevant section, § 14, provided a timeline with "target dates" and "outside dates" for the completion of certain stages of constructing the development project.  If PLV failed to meet any of the "outside dates" in the timeline, Hamilton was empowered to terminate the Development Agreement and lease.[3]

Consistent with the obligations set forth in the Development Agreement, PLV began to seek financing for the Project in late 2012.  MIF agreed to provide a short-term loan (the "Bridge Loan") that would stay in place while PLV secured long-term funding.  The Bridge Loan was intended to cover expenses incurred to date and to show proof of funds to other lenders who could provide a larger loan to cover the full costs of the Project.

MIF wanted certain protections to provide funding. Ultimately, these protections included: (1) Hamilton's promise to guarantee repayment of the Bridge Loan if PLV failed to pay, (2) Hamilton's grant to MIF of a mortgage on the Property, and (3) MIF's placement of the loan funds in an escrow account with a reputable New York bank that would disburse the funds only in accordance with a written escrow agreement.  In late November

---

"acknowledge[d] the fact that [PLV] ha[d] satisfied its obligations" under that section.

[3] The March 28, 2014 Deed of Variation did not delete § 14 but extended the deadlines for various Project benchmarks.

2012, BNYM entered the transaction as the Escrow Agent for the Bridge Loan, and the parties finalized the Escrow Agreement over the next several months.

On July 9, 2014, the MIF loan transaction closed, and the parties executed several agreements (together, the "Loan Documents") in connection with the transaction.  The Loan Documents included the Escrow Agreement, a Credit Agreement, a Guarantee, a Mortgage, a Note, a Deed of Surrender, and a Security Agreement.  The next section describes the finalized Escrow Agreement.

## II.  The Escrow Agreement

### A.  The Drawdown Provisions

This action turns on alleged breaches of the Escrow Agreement's provisions regarding distribution of the Bridge Loan funds.  Under the agreement, the funds were to be disbursed in two tranches -- an "Initial Drawdown" and a "Final Drawdown." The rules governing the Initial Drawdown of up to $1.2 million were as follows:

> 3.  Distribution of Escrow Property.  The Escrow Agent is directed to hold and distribute the Escrow Property in the following manner:
>
> 3.1  In order to obtain distributions of the Escrow Property to PLV (each such distribution referred herein as an "Initial Drawdown") up [to] a maximum aggregate amount of $1,200,000 ("Initial Drawdown Limit"), the parties noted in this section 3.1 shall comply with the following:

(a) PLV shall, for each Initial Drawdown, deliver to the Corporation a drawdown request certifying that the amounts set out therein are for the purposes of paying expenses associated with the Permanent Loan or as otherwise set forth in Schedule 8.7 of the Underlying Agreement ("Initial Drawdown Request");

(b) The Corporation and PLV shall provide written notice to the Escrow Agent stating that the Initial Drawdown Request delivered pursuant to subsection 3.1(a) above is approved by Corporation (such approval not to be unreasonably withheld, delayed or conditioned); and

(c) the Depositor shall provide written notice to the Escrow Agent that the Depositor has received the title insurance in accordance with the Underlying Agreement.[4]

3.2   Upon satisfaction of the above conditions, Escrow Agent shall, within three (3) Business Days after receiving written notices in accordance with clauses 3.1(b) and (c) above, transfer the Initial Drawdown as directed by PLV in the Initial Drawdown Request. It is agreed and understood that the aggregate of any number of Initial Drawdowns shall not exceed the Initial Drawdown Limit.

(Emphases supplied.)

The rules governing the Final Drawdown provided:

3.3   In order to obtain a distribution of the Escrow Property into the Senior Escrow, the parties shall, subject to section (d) below, comply with the following:

(a) PLV shall deliver to the Corporation (with copies to the Depositor for information purposes only): (i) a certification, signed by an officer [of] PLV, certifying that all conditions precedent have been satisfied for the funding of a loan of $225 million and an equity investment

---

[4] The "Underlying Agreement" was defined as the Credit Agreement entered into for the transaction.

of $100 million or for such substantially similar financing structure from the Permanent Lender in substance reasonably acceptable to the Corporation (in any event in an amount no less than the aggregate of the principal, fees, costs and interest outstanding on the Loan plus the Corporation Expense Payment), to PLV (the "Permanent Loan"); and (ii) copies of the Permanent Loan Funding Agreement, the Senior Escrow Agreement and all ancillary documents, duly executed by the parties thereto, and in form and substance reasonably acceptable to the Corporation; and

(b) No sooner than three (3) Business Days after receipt by the Corporation (and receipt of copies for information purposes only by the Depositor) of the items in subsection 3.3(a) above, the Corporation and PLV shall provide joint written notice to the Escrow Agent (i) stating that the documents delivered pursuant to subsection 3.3 (a)(i) and (ii) above are approved by the Corporation (such approval not to be unreasonably withheld, delayed or conditioned), and (ii) authorizing the disbursement to the Senior Escrow.

(c) PLV's obligation to provide Depositor with copies of the Permanent Loan Funding Agreement in accordance with in [sic] subsection 3.3(a)(ii) above will apply insofar as PLV is permitted to release same without being in breach of any confidentiality owed to the Permanent Lender, provided that PLV hereby undertakes to apply its best endeavors to have the Depositor included in a permitted category in the Permanent Loan Funding Agreement as it relates to confidentiality or non-disclosure.

. . . .

3.4  Upon satisfaction of the above conditions, Escrow Agent shall, within three (3) Business Days after receiving written notices in accordance with clauses 3.3(a) and (b) above, transfer the balance of the Escrow Property to the Senior Escrow; provided, the

Escrow Agent shall retain the Final Amount until the
condition in section 3.3(d) is satisfied.[5]

(Emphases supplied.)

The term "joint written notice" is not defined in the
Escrow Agreement.  "Senior Escrow" is defined as "an escrow to
be established by PLV, the Permanent Lender, and Escrow Agent
(or another escrow agent reasonably acceptable to the
Corporation) for the purpose of paying expenses associated with
the Permanent Loan."  Similarly, "Senior Escrow Agreement" is
defined as "the agreement among PLV, the Permanent Lender and
the Escrow Agent (or another escrow agent reasonably acceptable
to the Corporation) governing the Senior Escrow."  The Final
Drawdown was to be disbursed only to the Senior Escrow account.

The Permanent Loan was described as

a loan of $225 million and an equity investment of
$100 million or . . . such substantially similar
financing structure from the Permanent Lender in
substance reasonably acceptable to the Corporation (in
any event in an amount no less than the aggregate of
the principal, fees, costs and interest outstanding on
the Loan plus the Corporation Expense Payment).

The Permanent Loan Funding Agreement was defined as "the
agreement between the Permanent Lender and PLV which provides

---

[5] Another subsection of this portion of the Escrow Agreement,
subsection 3.3(d), required BNYM to retain a $500,000 "Final
Amount" in a separate escrow account until BNYM received written
notice from the "Interested Parties" (defined as MIF, PLV, and
Hamilton) that the loan had been paid in full.

for the Permanent Loan to PLV."  And the Permanent Lender was
defined as "the lender with respect to the Permanent Loan, which
shall be designated by written notice from PLV to the parties
hereto as part of the deliverables in accordance with subsection
3.3(a) and subject to subsection 3.3(c)."

B.   Other Provisions

In addition to the disbursement rules, other provisions in
the Escrow Agreement merit discussion.  The Escrow Agreement is
a fully integrated agreement.  Its stated purposes are to
"establish a controlled account for the escrowed funds in order
to perfect the Depositor's . . . security interest in such
funds" and to "restrict the disbursement of the escrow until the
satisfaction of certain conditions, specified below, relating to
the Permanent Loan to [be] obtained by PLV."  The agreement also
states that

> [w]hile the Escrow Property remains in escrow, the
> Escrow Agent will permit withdrawals of the Escrow
> Property only as permitted by Section 3 above.  PLV
> and the Depositor irrevocably authorize the Escrow
> Agent to disburse the Escrow Property in accordance
> with Section 3 above, and PLV and the Depositor
> further agree that they will not have access, now or
> any time hereafter, to any of the Escrow Property,
> except in accordance with Section 3 above.  This
> Agreement constitutes written notice by the Depositor
> and PLV to the Escrow Agent of the Depositor's
> security interest in the Escrow Property pursuant to
> the Security Agreement.

(Emphasis supplied.)

10

The Escrow Agreement provides certain protections for BNYM. The agreement states, for example, that BNYM "is authorized to comply with and rely upon any notices, instructions or other communications believed by it to have been sent or given by an Interested Party or by a person or persons authorized by an Interested Party." Similarly, the agreement provides that BNYM "shall not be responsible in any respect for the form, execution, validity, value or genuineness of documents or securities deposited hereunder." It also states that BNYM "shall not be subject to, nor required to comply with, nor required to inquire as to the performance of any obligation under, any other agreement between or among the Interested Parties (including the Underlying Agreement)."

The Escrow Agreement expressly limits BNYM's obligations and liability. It states that the "duties, responsibilities and obligations of the Escrow Agent shall be limited to those expressly set forth herein, and no duties, responsibilities or obligations shall be inferred or implied." It also provides that

> [t]he Escrow Agent shall not be liable for any action taken or omitted or for any loss or injury resulting from its actions or its performance or lack of performance of its duties hereunder in the absence of gross negligence or willful misconduct on its part. In no event shall the Escrow Agent be liable (i) for acting in accordance with or relying upon (and shall be fully protected in relying upon) any instruction,

<u>notice</u>, demand, certificate or document from any
Interested Party, any entity acting on behalf of any
Interested Party or any other person or entity which
it reasonably believes to be genuine . . . .

(Emphases supplied.)

The Escrow Agreement, in a section titled "Escrow Agent's
Obligations in the Event of Ambiguities, Conflicting Claims,
Etc.," grants BNYM certain discretion in the event of
uncertainty or ambiguity under the agreement.  It reads:

In the event of any ambiguity or uncertainty hereunder
or in any notice, instruction or other communication
received by the Escrow Agent hereunder, the Escrow
Agent <u>may, in its sole discretion, refrain from taking</u>
<u>any action</u> other than retain possession of the Escrow
Property, unless and until the Escrow Agent receives
written instructions, signed by the Interested
Parties, which eliminates such ambiguity or
uncertainty.

(Emphasis supplied.)

C.   Omissions from the Escrow Agreement

Finally, certain provisions are notably missing from the
Escrow Agreement.  Specifically, the agreement does not grant
MIF or BNYM any role in selecting the Senior Escrow agent or the
Permanent Lender.  It does not give either MIF or BNYM the right
to approve the Senior Escrow Agreement or the Permanent Loan
Funding Agreement.  While the agreement gives MIF the right to
see a copy of the Permanent Loan Funding Agreement and Senior
Escrow Agreement, it does not give BNYM that right.  And, it

does not allow MIF to control release of the escrow funds except in circumstances relating to a default by PLV.[6]

III. Legal Obstacles for the Transaction

Before turning to the events that transpired after the July 9, 2014 execution of the Escrow Agreement, it is useful to address certain legal obstacles that the Project encountered, as they are relevant to Hamilton's primary defenses.  These obstacles included (1) ensuring that Hamilton had the capacity to enter into the transaction and (2) obtaining the necessary government consents and legislative approvals for the Project.

A.   Hamilton's Capacity to Enter the Transaction

A primary legal issue surrounding the Project was Hamilton's capacity to enter into the various agreements for the Project.  Hamilton was created under the St. George's and Hamilton Act of 1793 (the "1793 Act").  The government later passed the Municipalities Act of 1923 (the "1923 Act"), which repealed many of the 1793 Act's provisions and now serves as Hamilton's governing statute.  Hamilton's powers are conferred by certain provisions the 1923 Act.[7]

---

[6] A co-lender exited the transaction after the Project funding negotiations deprived the lenders of the rights to approve the Permanent Lender and to direct the release of funds to a predetermined account.

[7] The extent of those powers is described in greater detail in the conclusions of law.

As a condition for extending the Bridge Loan, MIF required that Hamilton's legal counsel provide a legal opinion regarding Hamilton's statutory authority to provide a guarantee and mortgage to MIF.  On June 10, 2013, Hamilton's legal counsel, Terra Law Ltd. ("Terra Law"), provided a draft legal opinion to Conyers Dill & Pearman ("CDP"), MIF's Bermuda counsel, regarding Hamilton's role in the transaction.  The draft opinion noted that the Mortgage was valid and enforceable against Hamilton, but the opinion included a qualification stating that the 1923 Act was vague and that there was a risk that Terra Law's interpretation could be challenged.

This qualification was unacceptable to MIF, but MacLean's counsel, Johann Oosthuizen, explained that for Terra Law to provide an unqualified opinion, the 1923 Act would need to be amended to define Hamilton's powers more clearly and that proposed amendments were already under review by Bermuda's Parliamentary draftsman.  Ultimately, in early October 2013, the Bermuda legislature passed the Municipalities Amendments Act 2013 (the "Amendments Act"), which became effective on October 15.

In mid-May 2014, CDP reviewed the Amendments Act and raised questions for Oosthuizen and Terra Law about whether the amendments broadened Hamilton's power sufficiently.  A lawyer

from CDP commented to Oosthuizen that the "legislative
amendment . . . does not seem to address" the relevant issue
about Hamilton's capacity to provide a Guarantee, but noted that
it "may just be a question for [Hamilton's counsel] and the
opinion [that] firm can give" on the transaction.

On May 15, 2014, Terra Law circulated a revised legal
opinion that stated without qualification that Hamilton had the
power to enter into the transaction as planned.  The finalized
legal opinion (the "Terra Law Opinion") states, without
qualification, that Hamilton "is validly established and
existing as a body corporate under the laws of Bermuda, [and]
possesses the capacity to sue and be sued in its own name and
possesses the power and authority to enter into and perform its
obligations under" the agreements at issue.  It likewise states
that each of those agreements is "binding and enforceable"
against Hamilton.  Finally, it states that

> [n]o governmental or public consents, licenses,
> authorisations, approval, filings, etc. are required
> in connection with the execution, delivery and
> performance of each of Loan Documents to which the
> Corporation is a party, except those that have been
> duly obtained.

The "Loan Documents" referred to in the Terra Law Opinion were
identified as the Guarantee; the Escrow Agreement; the Credit
Agreement; the Note; the Deed of Surrender; the Mortgage;
another escrow agreement between PLV, MIF, Hamilton, and CDP; a

power of attorney from Hamilton to MIF; and an executed loan commitment letter between PLV, MIF, and Hamilton.

MIF relied on these assurances from Terra Law in agreeing to close the loan transaction.  It did not secure a formal opinion from its own counsel about whether Hamilton had the authority to enter into the various agreements comprising the transaction.

B.   Government Consents and Legislative Approvals

1.   Government Consents

After Hamilton offered to grant the Mortgage on the Property, Oosthuizen and CDP informed MIF that any foreign entity that wanted to obtain a security interest in Bermuda real estate needed consent from the government of Bermuda.  In March 2013, Oosthuizen prepared an application for such consent on behalf of MIF.  The Bermudan government granted its consent under Section 144 of the Bermuda Companies Act 1981 (the "Section 144 Consent") and under Section 80 of the Bermuda Immigration and Protection Act 1956 (the "Section 80 Consent"). Oosthuizen forwarded the documents memorializing both the Section 80 Consent and the Section 144 Consent to representatives of MIF and Hamilton on March 28, 2013.

The Section 144 Consent provides that Bermuda's Minister of Economic Development sanctioned the Mortgage.  The Section 144

Consent also lays out the principal terms of the loan, including an $18 million principal amount, and certain fees including a $900,000 facility fee, a $675,000 administration fee, and a $125,000 structuring fee.  It states that if "any of the foregoing details" are varied, the "consent becomes void."  The Section 80 Consent contains similar content as the Section 144 Consent, but it does not include the same voiding language.

### 2.   Legislative Approvals

In addition to the government consents, the Bermuda legislature needed to approve certain of the Loan Documents. Specifically, § 20(1A) of the 1923 Act requires the Bermuda legislature's approval of certain draft agreements relating to the disposition of land owned by Hamilton.

The parties discussed these approval requirements in early October 2013, after the Amendments Act became effective.  The parties corresponded in late 2013 with a representative of the Bermudan government, Minister of Home Affairs Michael Fahy, about the submission to the government of certain draft Loan Documents, including the Escrow Agreement.  One question that arose was whether it was necessary for the legislature to approve the Mortgage and agreements related to the Mortgage.  In a later dated December 10, 2013, Minister Fahy stated: "I have been advised, and I am satisfied, that the Mortgage and any

17

related agreements pertaining to the Mortgage do not need to be submitted for the approval of the Legislature under" the relevant statute.

Nonetheless, the question of the Mortgage persisted into the next year.  In May 2014, the parties' counsel again discussed whether legislative approval of the Mortgage was required, with CDP noting that "we are not sure one can get comfortable that the Minister's letter" overrides a statutory requirement.  To be safe, the parties submitted the Mortgage to the legislature for review.  During these discussions, none of the parties proposed sending the Escrow Agreement to the legislature for review.

Ultimately, the parties submitted the Guarantee, Mortgage, and Deed of Surrender to the legislature for approval.  On June 13, 2014, the Bermuda House of Assembly approved these draft documents.  The Bermuda Senate approved the same on June 25.

IV.  Events After Execution of the Loan Documents

The loan transaction closed on July 9, 2014, and the parties executed the Escrow Agreement and the other Loan Documents on that day.  MIF then sent the signed Escrow Agreement to BNYM and, on July 10, BNYM signed and returned the fully executed agreement to MIF.

MIF funded the loan on July 14.  It wired two payments --
one for $14,949,858 and another for $500,000, which, pursuant to
the terms of the agreement, was to be kept in a separate escrow
account that is not at issue in this case.[8]  MIF funded the loan
by selling loan participations.  Specifically, 90% of the loan
was funded by loan participants,[9] while only 10% was funded by
the partners of MIF.

A.    The Initial Drawdown

As explained above, PLV's ability to receive the Initial
Drawdown of up to $1.2 million depended on the satisfaction of
three conditions: (1) PLV sending a request certifying that the
amounts to be drawn down were to be used in one of the ways
authorized in the Escrow Agreement, (2) Hamilton and PLV
providing written notice to BNYM stating that Hamilton approved
the request, and (3) MIF providing written notice that MIF had
received title insurance in accordance with the Credit
Agreement.

---

[8] Although the total amount that PLV borrowed was $18 million,
the escrow accounts were funded with only $15,449,858 total
because the remaining amount was allocated to pre-payment of
interest, fees, and expenses.

[9] A loan participant buys a portion of an existing loan and does
not have a direct contractual relationship with the borrower or
the right to receive repayments directly.

On August 8, 2014, PLV and Hamilton sent written notices confirming that PLV's request for the Initial Drawdown had been approved.  BNYM reviewed these notices and found that they satisfied the Escrow Agreement.  On August 11, however, Gonzalez, MIF's Manager, emailed Regina Jones of BNYM stating, "FYI we have NOT yet finalized the title commitment so do not release the PLV draw.  We'll keep you posted when it comes in." Based on this email, BNYM did not process the Initial Drawdown. This was the first and only time that MIF told BNYM not to disburse funds from the escrow account.

MIF had been working on securing title insurance for over a month.  MIF had originally worked with Stewart Title Insurance Company ("Stewart Title") to obtain title insurance, but Stewart Title excluded coverage for any "claim or loss by reason of any lack of legal or constitutional authority by the Corporation of Hamilton to act as mortgagor and/or guarantor of the Insured Mortgage over the Land."  After failing to convince Stewart Title to remove this carveout, MIF worked with a new insurer, Fidelity Insurance Company ("Fidelity") to secure title insurance.  Fidelity was willing to provide a clean title policy without the carveout regarding Hamilton's legal or constitutional authority.

Gonzalez sent Jones the title insurance on August 14.  At that time, BNYM processed the Initial Drawdown request and sent MIF a screenshot advising MIF that it had wired $1.2 million to an account at Clarien Bank Ltd. ("Clarien Bank") in the name of Michael and Yasmin MacLean.  Jones was aware that the account belonged to an individual and that the individual (Michael MacLean) was the owner of PLV.

B.   The Final Drawdown

It is the Final Drawdown that is at the heart of this litigation.  As explained above, the Final Drawdown of the remaining $13,749,858 depended on satisfaction of two major conditions -- (1) PLV delivering to Hamilton: (a) a certification that the conditions precedent for the Permanent Loan had been satisfied, and (b) executed copies of the Permanent Loan Funding Agreement and the Senior Escrow Agreement; and (2) Hamilton and PLV providing joint written notice to BNYM that those documents had been approved by Hamilton and that the disbursement to the Senior Escrow was authorized.

1.   The Permanent Funding

In early October, MacLean of PLV informed MIF that PLV was considering various entities including Renaissance Capital Group LLC ("Renaissance") and an individual named Robert McKellar of

21

Argyle Ltd. ("Argyle") for roles in the permanent financing arrangement.  MIF was suspicious of the proposed arrangement and, on October 14, asked for a status conference with PLV and Hamilton to discuss the Permanent Loan and "contingency plans" for repayment of the Bridge Loan.  Oosthuizen (MacLean's counsel) replied saying that PLV was negotiating the senior loan and that it was "premature and therefore inappropriate" for MIF to contact Hamilton midway through the Bridge Loan term.  PLV's London counsel warned PLV against a transaction with Argyle, an unregulated entity, but PLV chose to proceed with Argyle anyway.

PLV and Argyle continued to negotiate, with involvement from Hamilton.  On October 27, Oosthuizen sent MacLean a new draft of an agreement that included an entity called the Skyline Trust ("Skyline") as a counterparty instead of PLV.  PLV sent the signed agreement to McKellar on October 28.  On October 31, Argyle returned a fully executed copy to PLV.  In his cover email, McKellar stated, "I return the signed Agreement.  It is dated 20 October but please re date it with today's date."

The finalized agreement is titled Co-Venture Trade and Profit Share Agreement and is between Argyle and Shane Mora and Matthew Hollis as trustees of Skyline (the "TPSA").  Neither Hamilton nor PLV is a party to the TPSA.  Under the TPSA, Skyline agreed to pay Argyle a non-refundable fee of $12.5

million and, in return, Argyle agreed to make trades using roughly $125 million in credit.  The first $18 million in profit would be paid directly to Skyline (to allow PLV to repay the Bridge Loan), and Argyle and Skyline would share additional profits, with 80% going to Skyline and 20% to Argyle.

The TPSA is not a loan agreement.  It does not reference a lender, borrower, or a loan to PLV.  It also does not include interest or a repayment schedule.  In depositions, MacLean and Graeme Outerbridge, the Mayor of Hamilton, acknowledged that they were aware of the risk that the TPSA would fail to generate a profit.

### 2.  The Notices to BNYM

On October 24, roughly a week before the TPSA was finalized and executed, Hamilton and PLV each sent a notice to BNYM authorizing the Final Drawdown.  The first was sent on October 24 at 5:04 p.m. to Jones at BNYM from Edward Benevides, Hamilton's Chief Operating Officer and Secretary (the "Hamilton Notice").  The Hamilton Notice was entitled "Notice of Approval of Disbursement from Escrow Account."  The Hamilton Notice stated that

> PLV has delivered to the Corporation the documents referred to in subsections 3.3(a)(i) and (ii) of the Escrow Agreement and the Corporation has received and approved said documents on a date falling not less than three (3) Business Days before the date hereof.

> Accordingly, the Corporation hereby authorizes and
> directs a disbursement from the Escrow Account . . . .

The documents identified in § 3.3(a)(ii), which Hamilton

represented that it had received from PLV, included a Permanent

Loan Funding Agreement and a Senior Escrow Agreement.  Hamilton

had received neither.  Nor had Hamilton received a signed

certification, as required by § 3.3(a)(i).

The Hamilton Notice then directed BNYM to disburse the

balance of the Bridge Loan funds to a Clarien Bank account in

the name of Michael and Yasmin MacLean, which the notice

identified in bold letters as the "Senior Escrow" account.  The

account number for the account was the same as that listed for

the disbursement of the Initial Drawdown.  Finally, the Hamilton

Notice stated that

> this letter constitutes the Corporation's formal
> notice to the Escrow Agent that the said Disbursement
> to the Senior Escrow has been <u>authorised by the
> Corporation and by PLV in accordance with subsection
> 3.3(b) of the Escrow Agreement</u>.

(Emphasis supplied.)

At 7:55 p.m. on October 24, MacLean sent Jones a separate

notice from PLV (the "PLV Notice").  MacLean's cover email to

Jones opened: "Further to the release notice sent by Mr.

Benevides of the Corporation of Hamilton please find attached

PLV's require[d] <u>joint notice of release</u>."  (Emphasis supplied.)

24

The PLV Notice was substantively identical to the Hamilton Notice. Both notices represented that "PLV has delivered to the Corporation" the required documents and that "the Corporation has received and approved said documents." Both identified the same Clarien Bank account belonging to Michael and Yasmin MacLean as the Senior Escrow account. And both stated that the notices "constitute[d] [the parties'] formal notice to the Escrow Agent that the said Disbursement to the Senior Escrow has been authorised by PLV and by the Corporation in accordance with subsection 3.3(b) of the Escrow Agreement."

On October 27 at 7:38 p.m., BNYM sent an email to Benevides, Outerbridge, MacLean, Oosthuizen, and Gonzalez. In the email, BNYM's Jones explained that she had received "the following docs" relating to the Final Drawdown request:

1- An executed Notice of Approval of Disbursement (dd 10.24.14) from Par-La-Ville Hotel and Residences, Ltd. (PLV)

2- The Corporation of Hamilton's acknowledgement of receipt and approval of PLV's Notice.

She continued that since BNYM was "in receipt of the two aforementioned documents," she would "proceed to have the Disbursement Amount released on Wednesday (10/29)."

MIF had not received the TPSA or any substantive updates since reviewing an early draft financing agreement involving Renaissance. Accordingly, Gonzalez responded to Jones's email

25

by sending a "High Importance" email to BNYM asking "[t]o what account is the money being asked to be sent" and inquiring whether BNYM had conducted "KYC," or Know-Your-Customer, diligence on that account.  Jones's colleague at BNYM, Faraz Khan, responded the following morning, October 28, stating:

> The account is listed on the notice provided.  We have received all required documents to make the transfer. KYC is only required on the contracting parties and not the account holder.  As long as we receive the required documentation for the transfer, we are ok to execute.  Let me know if you have any concerns.  Thank you.

The same morning, MacLean emailed Jones stating that PLV "would like to have these funds released before noon EST today" and asking that "[i]f that is not possible, please provide good reason for the delay."  That evening at 4:04 p.m., another BNYM employee responded to MacLean's email by providing "the Fed # for the release of the $13M plus in accordance to the joint instruction provided."  At this point, Gonzalez had not raised any further concerns in response to Khan's October 28 email.

On October 29 at 10:15 a.m., Gonzalez asked Khan to "get a verbal confirmation from the signatories from the corporation . . . confirming the Disbursement Request account information."  Khan called representatives of Hamilton, confirmed the account information, and reported back to Gonzalez.  He then emailed his colleagues at BNYM to explain

26

that he had confirmed with Hamilton and that "BNYM is ok to release the funds."

When the funds were released, the receiving bank, Clarien Bank, was concerned about the size and complexity of the transaction and froze MacLean's account after he attempted to transfer some of the funds to Argyle.  Oosthuizen then worked with Hamilton to provide confirmations of the transaction for Clarien Bank, which ultimately unfroze the account and permitted a transfer of funds to Argyle.  After the account was unfrozen, from October 31 to November 7, a total of $12.5 million was transferred from MacLean's account at Clarien Bank to Argyle.

McKellar (of Argyle) stopped communicating with MacLean around February 2015.  The Bridge Loan funds were lost.

V.   Default on the Loan

Shortly after BNYM notified MIF, Hamilton, and PLV that it planned to release the Final Drawdown funds, MIF attempted to better understand the situation and to communicate its concerns with PLV and Hamilton.  On October 27 or 28, MacLean called Gonzalez to provide an update on the transaction.  During the call, MacLean explained that PLV had chosen Argyle as the lender.  Gonzalez has testified that he requested to see copies of the certification letter to Hamilton, the joint disbursement notice to BNYM, and the Permanent Loan Funding Agreement and

Senior Escrow Agreement, and that MacLean refused to provide them, asserting confidentiality concerns.

Over the next several weeks, Gonzalez repeatedly communicated with Hamilton and PLV about his concerns but did not receive responses that were satisfactory to him.  MIF grew increasingly concerned that PLV might fail to repay the Bridge Loan by the maturity date of December 30, 2014.  Thus, on December 11, MIF sent an email to BNYM requesting copies of the disbursement request and account statement.  It received the Hamilton Notice and the PLV Notice from BNYM the following day. This was the first time that MIF requested the notices from BNYM.[10]

Also on December 11, MIF sent PLV requests for copies of the wire transfers to Argyle, the permanent loan documentation, and the "conditions precedent certification of 3(3)a(i) of the escrow agreement which should have been delivered to us at the time of the disbursement request."  With help from Oosthuizen, MacLean then prepared a signed version of the certification letter and sent it to Hamilton's offices between December 12 and 17.  This was the first time that Hamilton had received the certification.

---

[10] At trial, MIF's Manager suggested that MIF had asked BNYM for copies of the notices in October.  The Court finds that MIF did not do so.

In early 2015, PLV finalized "Unanimous Written Resolutions" that PLV and Hamilton contemplated would serve as the Senior Escrow Agreement.  These resolutions are backdated to October 20, 2014.

On December 15, 2014, MIF circulated a letter to PLV and Hamilton declaring an event of default under the Credit Agreement.  The letter complained of, inter alia, PLV's failure to provide the certification and other documents and the failure to transfer the funds to a Senior Escrow.  On December 31, with the Bridge Loan still unpaid, MIF circulated a default notice to PLV and Hamilton declaring a second event of default.  MIF also sent this notice to BNYM, requesting that it transfer the remaining $500,000 held in escrow.  BNYM transferred the remaining funds to MIF on January 6, 2015.

VI.   MIF Commences Litigation

After PLV failed to repay the Bridge Loan, MIF sought to recover its losses through litigation.  It first commenced litigation against PLV in January 2015 in the Bermuda Supreme Court.[11]  In May 2015, the Bermuda Supreme Court awarded summary judgment to MIF in the amount of $19,397,819.  Following this

---

[11] The Bermuda Supreme Court is the court of first instance in civil matters.  The Court of Appeal hears appeals from the Bermuda Supreme Court.  The Privy Council in the United Kingdom ("Privy Council") is the court of last resort.

judgment, PLV went into liquidation.  Ultimately, MIF was able to recover from the liquidation only $1,049,920.40, which was garnished from an account of PLV's former counsel.

Around the same time, MIF commenced litigation in the Bermuda Supreme Court against Hamilton to enforce the Guarantee. Although Hamilton originally agreed to confess judgment and enter a Consent Order, in May 2016, with new counsel, it sought to set aside the Consent Order on the ground that the Guarantee was ultra vires.

On November 18, 2016, the Bermuda Supreme Court held that the Guarantee was ultra vires.  In its Opinion, that court noted that "[t]here may be other causes of action available to MIF against the Corporation" and that its judgment setting aside the Consent Order "does not determine that MIF cannot recover the amount of the loan monies from the Corporation; merely that it cannot do so by enforcing an ultra vires Guarantee."  On May 12, 2017, the Bermuda Court of Appeal affirmed the lower court's decision.  And, in a 3-2 decision entered on January 21, 2019, the Privy Council affirmed the Court of Appeal's ruling.  The Opinion of the Privy Council, as it bears on the instant action, is discussed in greater detail in the conclusions of law below.

### Procedural History

MIF filed this action on July 19, 2017 in New York state court.  It was removed to this Court on August 23.  The complaint asserted causes of action for breach of contract, breach of fiduciary duty, negligence, fraud, negligent misrepresentation against Hamilton, and for breach of contract, breach of fiduciary duty, and gross negligence against BNYM.

BNYM and Hamilton each filed a motion to dismiss on December 15.  In an Opinion and Order of March 14, 2019, Hamilton's motion to dismiss was denied; BNYM's motion was granted as to the gross negligence claim, but otherwise denied. Mex. Infrastructure Fin., LLC v. Corp. of Hamilton, No. 17-CV-6424 (VSB), 2019 WL 1206690 (S.D.N.Y. Mar. 14, 2019).

On July 2, 2019, BNYM moved for judgment on the pleadings, and on September 27, Hamilton moved for summary judgment.  These motions were resolved in an Opinion and Order of August 7, 2020. Mex. Infrastructure Fin., LLC v. Corp. of Hamilton, No. 17-CV-6424 (VSB), 2020 WL 4572679 (S.D.N.Y. Aug. 7, 2020).  BNYM's motion for judgment on the pleadings was denied with respect to the breach of contract claim but was granted with respect to the breach of fiduciary duty claim, as it was duplicative of the breach of contract claim.  Id. at *6.

31

Hamilton's motion for summary judgment was based in part on its defense that the Escrow Agreement was <u>ultra vires</u>. Hamilton's motion for summary judgment based on the <u>ultra vires</u> defense was denied. <u>Id.</u> at *8. In denying this motion, the Court reviewed the Privy Council's opinion holding that the Guarantee was <u>ultra vires</u>. <u>Id.</u> at *7. The Court explained that MIF could "defeat Hamilton's <u>ultra vires</u> argument under Bermuda law only by showing that the Escrow Agreement was reasonably incidental to Hamilton's express powers." <u>Id.</u> The Court continued:

> As explained by the Privy Council Judgment, in asking whether a power is reasonably incidental to the exercise of an express power, it is necessary to examine the express power that was exercised.  The Privy Council unambiguously stated that Hamilton had power to dispose of an interest in its land and was thus able to enter into the development agreement. The Privy Council further stated that if PLV did not demonstrate that it had obtained the finance needed to complete the hotel, Hamilton could terminate the development agreement and the developer would never be able to complete the development.  The Escrow Agreement provision at issue in this case obligated Hamilton to review PLV's permanent loan funding documentation, and certify that PLV satisfied the conditions precedent to obtaining proper financing in furtherance of the development.  Such involvement in the escrow disbursement authorization process can be said to be necessary, and thus "reasonably incidental," to the express powers outlined by the Privy Council; for if Hamilton had the power to terminate the Development Agreement based on PLV's progress in obtaining financing, it would need the ability to review PLV's financing arrangements -- as called for by the Escrow Agreement -- to make sure that the financing was in substance reasonably

> acceptable.  This is especially likely considering
> that, under the Development Agreement -- which the
> Privy Council necessarily concluded was <u>intra vires</u> --
> PLV was obligated to present to Hamilton its financing
> approval documentation.  In other words, the purpose
> of the Escrow Agreement was not to assist PLV in the
> raising of finance as Hamilton suggests; rather,
> Hamilton's approval of PLV's permanent loan funding
> documentation was necessary for Hamilton's own
> execution of the Development Agreement, and thus
> reasonably incidental to its express powers.

<u>Id.</u> at *8 (citation omitted).  Thus, the Court held that

Hamilton had not shown that it was entitled to summary judgment

on <u>ultra vires</u> grounds.  <u>Id.</u>  The Court did, however, grant

Hamilton summary judgment on MIF's claims for negligence, breach

of fiduciary duty, negligent misrepresentation, and fraud,

because those claims were duplicative of the breach of contract

claim.  <u>Id.</u>  Accordingly, all that remained in the case were the

breach of contract claims against both Hamilton and BNYM.

On August 21, Hamilton moved to reconsider the August 7

Opinion.  This motion was denied on September 21.  <u>Mex.</u>

<u>Infrastructure Fin., LLC v. Corp. of Hamilton</u>, 17-CV-6424 (VSB),

202 WL 5646107 (S.D.N.Y. Sept. 21, 2020).

After this motion practice, the parties engaged in

extensive international discovery, including the issuance of

letters rogatory on July 29, 2021 and August 10, 2022.  On

August 17, 2022, the case was reassigned to this Court.

After the close of discovery, the parties timely filed
their joint pretrial order, proposed findings of fact and
conclusions of law, and pretrial memoranda of law on May 26,
2023.  That same day, BNYM filed three motions in limine -- one
to strike the expert reports of plaintiff's proposed expert
Saverio Lunetta, one to preclude testimony and evidence
concerning BNYM's policies and procedures, and one asserting the
law of case doctrine to bar testimony or argument from Hamilton
on the ultra vires issue.

On June 2, the parties filed responsive papers.  MIF's
responses included an opposition to the motion to strike the
Lunetta reports, as well as an opposition to the motion to bar
evidence on BNYM's policies and procedures that included a
related request to reopen discovery.  Additionally, MIF joined
in BNYM's motion in limine to bar testimony or argument on the
ultra vires defense.  Hamilton filed an opposition to that
motion as part of its omnibus pretrial response memorandum.

On June 8, the motion to strike the Lunetta reports was
granted.  In a final pretrial conference held on June 16, the
Court provided its reasoning for striking the Lunetta reports.
Also at that conference, the Court denied MIF's request -- made
in opposition to one of BNYM's motions in limine -- to reopen
discovery.  It noted, however, that, should the Court find that

34

BNYM breached its obligations under the Escrow Agreement, it
would give MIF an opportunity to renew its request for discovery
into the bank's policies and procedures.  The Court also denied
the motion in limine to bar evidence and argument on the ultra
vires defense, without prejudice to revisiting the law of the
case issue raised by BNYM and MIF in the motion.

A bench trial was held on June 28, 2023.  Pursuant to this
Court's Individual Practices in Civil Cases regarding non-jury
trials and without objection by the parties, the parties offered
the direct testimony of their fact witnesses at trial by
affidavit.  They offered the testimony of their expert witnesses
by expert report.  These affidavits and reports, along with the
documents constituting the parties' evidence in chief, were
submitted to the Court with the parties' other pretrial
materials on May 26.

MIF presented direct testimony from one fact witness,
Xavier Gonzalez, the Manager of MIF.  BNYM presented direct
testimony from two fact witnesses, Regina Jones, a Vice
President, Client Services Manager at BNYM who administered the
escrow account at issue in this case, and Faraz Khan, a
Relationship Manager at BNYM who managed BNYM's relationship
with the parties to the Escrow Agreement.  Hamilton presented an
expert report from the Honorable Michael J. Beloff, an expert on

Bermuda law, and MIF presented an opposition report from the
Honorable Lord David Neuberger of Abbotsbury (the "Neuberger
Report").  Hamilton also submitted a reply expert report.
Additionally, the parties presented testimony by deposition of
Graeme Outerbridge, the Mayor of Hamilton at the relevant times,
Edward Benevides, the Chief Operating Officer and Secretary of
Hamilton at the relevant times, and Michael MacLean, the
director and principal of PLV.  BNYM also presented the
testimony by deposition of Orlando Mendez Piñon, an analyst at
Alsis, and Francesca Fox, a real estate lawyer at CDP who
represented MIF in the loan transaction.  They also submitted
deposition testimony from the testifying witnesses, Gonzalez,
Jones, and Khan.

At the June 28 trial, the three fact witnesses were cross-
examined.  The parties had waived their rights to cross-examine
the two experts.

## Conclusions of Law

The Escrow Agreement includes a New York choice-of-law
provision.  Under New York law, a plaintiff bringing a breach of
contract claim "must prove: (1) the existence of a contract, (2)
performance by the party seeking recovery, (3) nonperformance by
the other party, and (4) damages attributable to the breach."
Moreno-Goody v. Kartagener, 7 F.4th 78, 85 (2d Cir. 2021)

(citation omitted).  The burden of proof on a breach of contract claim is on the party asserting breach.  Id.

Under New York law, a contract "that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc., 7 F.4th 50, 56 (2d Cir. 2021) (citation omitted).  A contract is unambiguous if its language has "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion."  Olin Corp. v. OneBeacon Am. Ins. Co., 864 F.3d 130, 148 (2d Cir. 2017) (citation omitted).  "If the terms of a contract are clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself."  Steiner v. Lewmar, Inc., 816 F.3d 26, 32 (2d Cir. 2016) (citation omitted).

To determine whether disputed contract language is ambiguous, a court must ask whether it is "ambiguous when read in the context of the entire agreement."  32BJ N. Pension Fund v. Nutrition Mgmt. Servs. Co., 935 F.3d 93, 100 (2d Cir. 2019) (citation omitted).  "[W]here consideration of the contract as a whole will remove the ambiguity created by a particular clause,

there is no ambiguity." Law Debenture Tr. Co. of N.Y. v.
Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010).  In
interpreting contracts, "words should be given the meanings
ordinarily ascribed to them and absurd results should be
avoided." Mastrovincenzo v. City of New York, 435 F.3d 78, 104
(2d Cir. 2006) (citation omitted).

        "Causation is an essential element of damages in a breach
of contract action; and, as in tort, a plaintiff must prove that
a defendant's breach directly and proximately caused" its
damages. Diesel Props S.r.L. v. Greystone Bus. Credit II LLC,
631 F.3d 42, 52-53 (2d Cir. 2011) (citation omitted).  Thus,
recovery is not permitted "if the claimed losses are the result
of other intervening causes." Id. at 53 (citation omitted).

        "When a question of proximate cause involves an intervening
act, liability turns upon whether the intervening act is a
normal or foreseeable consequence." Badilla v. Midwest Air
Traffic Control Serv., Inc., 8 F.4th 105, 135 (2d Cir. 2021)
(citation omitted).  Thus, "the mere fact that other persons
share some responsibility for plaintiff's harm does not absolve
defendant from liability because there may be more than one
proximate cause of an injury." Hain v. Jamison, 28 N.Y.3d 524,
529 (2016) (citation omitted).  Accordingly, "only where the
intervening act is extraordinary under the circumstances, not

foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct" may the intervening act break the causal nexus.  Id. (citation omitted).

Several factors may be relevant in assessing proximate cause, including, but not limited to, "the foreseeability of the event resulting in injury"; "the passage of time between the [defendant's conduct] and the intervening act"; "whether and, if so, what other forces combined to bring about the harm"; and "public policy considerations regarding the scope of liability." Id. at 530.  Although the relevant factors may differ in each case, "the most significant inquiry" in the analysis "is often that of foreseeability."  Id.

I.   Breach of Contract Against Hamilton

Hamilton breached the Escrow Agreement.  It is undisputed that the Escrow Agreement existed, that MIF performed its obligations under that agreement, and that MIF suffered damages. In addition, as explained below, Hamilton breached multiple provisions relating to the Final Drawdown and these breaches factually and proximately caused MIF's damages.  Accordingly, Hamilton is liable for MIF's damages.

A.   Hamilton's Breaches

The Final Drawdown rules required that PLV deliver to Hamilton a certification stating that all conditions precedent

39

for funding the Permanent Loan had been satisfied, as well as "duly executed" copies of the Permanent Loan Funding Agreement, the Senior Escrow Agreement, and all ancillary documents that were "in form and substance reasonably acceptable to the Corporation." At least three days after receipt of these items, Hamilton and PLV were to provide joint written notice to BNYM stating that the documents were approved by Hamilton and authorizing the Final Drawdown. Hamilton breached these rules in multiple ways.

First, Hamilton authorized the Final Drawdown even though PLV had not secured a Permanent Loan meeting the definition in the Escrow Agreement. The Permanent Loan was required to consist of "a loan of $225 million and an equity investment of $100 million" or "such substantially similar financing structure" that was "in substance reasonably acceptable to the Corporation" and "in any event in an amount no less than" $18 million. The TPSA did not satisfy the requirements of the Escrow Agreement.

At the outset, the TPSA is not designated as a loan and has none of the typical hallmarks of a loan, such as a repayment schedule or interest. Nor did it provide at least $18 million in funds to PLV. Even though the TPSA provided that the first $18 million would be given to Skyline and that remaining profits

40

would be split between Skyline and Argyle, there was no guarantee that the agreement would yield $18 million for Skyline and thus for PLV.

Second, even assuming that the TPSA could qualify as a Permanent Loan, Hamilton was required to receive a "duly executed" copy of the TPSA before authorizing the Final Drawdown.  But the TPSA was not finalized when Hamilton authorized the disbursement.  Hamilton provided BNYM with the Hamilton Notice on October 24, 2014.  The TPSA, however, was not finalized until October 31, when McKellar returned the signed agreement to PLV.

Third, when it authorized the Final Drawdown, Hamilton had also not received a certification from PLV that all conditions precedent to funding a Permanent Loan had been satisfied, as required by the Escrow Agreement.  This certification did not even exist until PLV created it in December 2014.

Fourth, Hamilton had not received a duly executed copy of the Senior Escrow Agreement, which was required to authorize the Final Drawdown.  Although representatives of Hamilton suggested that PLV's Unanimous Written Resolutions could serve as the Senior Escrow Agreement, these resolutions were not finalized in time for Hamilton to authorize the Final Drawdown.  Thus, for

all of these reasons, when Hamilton authorized the disbursement
at issue in this case, it breached its obligations to MIF.

    B.   Causation

    Hamilton's breaches factually and proximately caused MIF's
damages.  Under the Escrow Agreement, MIF retained a security
interest in the escrowed funds.  To protect this interest, the
drawdown rules were inserted to ensure that the funds were not
disbursed except to a Senior Escrow account and only after the
requirements for permanent funding of the Project were in place.
Hamilton's role in the Escrow Agreement was to oversee PLV's
attempt to secure permanent funding and to sign off on various
components of the permanent funding scheme.  Through this,
Hamilton was meant to ensure that the Project moved forward as
planned and that the Bridge Loan funds were not squandered.

    Hamilton abdicated this role.  It never received, let alone
reviewed, duly executed agreements resembling a Permanent Loan
Funding Agreement or a Senior Escrow Agreement.  Further, the
documents that Hamilton did receive and review revealed that
PLV's intended financing carried uncontrolled risk.
Specifically, the TPSA required that PLV provide millions of
dollars upfront to McKellar in the hope that McKellar might reap
a profit through a complicated trading scheme.  Hamilton's
representatives were told and knew that the TPSA did not

guarantee a profit, even though the Escrow Agreement required that the Permanent Loan include at least $18 million to cover the Bridge Loan.

In essence, Hamilton knew that PLV planned to send the Bridge Loan funds to a gambler who would try (but would not guarantee) to earn at least $18 million in return. Turning a blind eye, Hamilton nonetheless authorized the Final Drawdown, knowing that the requirements for the disbursement had not been satisfied. Within a couple of months, the funds were lost. The only external force relevant to that loss was McKellar -- the very person that Hamilton failed to vet. Thus, that the Bridge Loan funds were ultimately lost was entirely foreseeable for Hamilton.

Hamilton argues that its actions did not proximately cause MIF's losses because of intervening acts that break the causal chain. Hamilton identifies a collection of purportedly intervening events including: (1) BNYM emailing the parties informing them that BNYM would disburse the funds, (2) Gonzalez and MacLean discussing the drawdown and PLV's plans, (3) BNYM releasing the funds to Clarien Bank, (4) MacLean making transfers out of the Clarien Bank account, and (5) McKellar absconding with the funds. The argument fails.

The only one of these events that merits serious discussion
is the last, but even McKellar's wrongful actions do not break
the causal chain.[12]  Hamilton's proximate cause argument with
respect to McKellar's actions boils down to this:  If McKellar
had lost the funds by executing trades as he promised under the
TPSA, proximate cause would exist; but, since he instead lost
the funds because he stole them, proximate cause does not exist.
Through this argument, Hamilton essentially seeks a rule whereby
defendants must reasonably foresee every detail of a plaintiff's
injury.  But Hamilton points to no authority suggesting such
foreknowledge is required.

Under New York law, "where the risk of harm created by a
defendant's conduct corresponds to that which actually results,"
proximate cause typically will exist, "absent an extraordinary
intervening act or significant facts weighing in favor of
attenuation."  Hain, 28 N.Y.3d at 530.  When Hamilton authorized
the Final Drawdown, it created a risk that the funds would be
disbursed to an entity who would lose them and that PLV would
therefore be unable to repay MIF.  That risk is exactly what

---

[12] The other four events amount to a series of steps resulting in
the release of funds to McKellar.  Hamilton authorized the
disbursement specifically intending that the funds land in the
hands of McKellar, PLV's intended financing partner.  Hamilton
cannot seriously argue that the steps necessary to send the
funds to McKellar were unforeseeable.

transpired.  "That [Hamilton] could not predict the exact manner in which [McKellar would lose the funds] does not preclude liability because the general risk and character of injuries was foreseeable."  Hain, 28 N.Y.3d at 533.

Hamilton asks that its abdication of its contractual duties be overlooked because Hamilton is a small community and its elected leaders were not sophisticated businessmen.  Mayor Outerbridge is a photographer.  These requests for sympathy do not release Hamilton of its obligations under the Escrow Agreement.  Hamilton had the ability to retain qualified expert advice.  When PLV got advice from its London counsel, it was warned not to trust Argyle, an unregulated entity, with $12 million.  Hamilton, a government body represented by counsel, should have understood that an entity's request for millions of dollars to fund a "get rich quick" trading scheme may have been a scam.  The fact that the "trader" ultimately stole the money, instead of losing it on the market, does not alter the analysis. Hamilton approved and facilitated the transfer of funds to Argyle understanding that there was no guarantee that the funds would be repaid.

C.   Hamilton's Remaining Defenses

Aside from its points about proximate cause, Hamilton does not contest in any serious way that it breached the Escrow

Agreement.  Instead, Hamilton relies primarily on various arguments that the Escrow Agreement was impermissible under Bermuda law.  It also asserts that MIF waived its breach of contract claim and lacks standing to bring the claim.  Each of these arguments fails.

    1.  Bermuda Law Defenses

        i.  Ultra Vires

    Hamilton first asserts that the Escrow Agreement was <u>ultra vires</u> under Bermuda law.[13]  This is incorrect.

    As a preliminary matter, MIF and BNYM argue that the Court should not reach the merits of the <u>ultra vires</u> issue based on the law of the case doctrine, contending that the issue was already decided when the Court denied Hamilton's motion for summary judgment and its motion for reconsideration of that ruling.  The law of the case doctrine generally "forecloses reconsideration of issues that were decided -- or could have been decided -- during prior proceedings."  <u>Choi v. Tower Rsch. Cap., LLC</u>, 2 F.4th 10, 21 (2d Cir. 2021) (citation omitted).  The doctrine is "discretionary," however, and "does not limit a court's power to reconsider its own decision prior to final

_____

[13] The parties disagree over whether Bermuda or New York law should determine the <u>ultra vires</u> question.  Even assuming Hamilton's preferred choice of law, Bermuda law, applies, Hamilton's arguments lack merit.  Accordingly, the Court will assume without deciding that Bermuda law applies.

judgment." <u>Cangemi v. United States</u>, 13 F.4th 115, 140 (2d Cir. 2021) (citation omitted).  Reasons to depart from the law of the case include the availability of new evidence.  <u>Choi</u>, 2 F.4th at 21.

The doctrine is inapplicable here.  The <u>ultra vires</u> issue was decided only to the extent that the Court declined to grant summary judgment to Hamilton on the defense.  Now, with the benefit of evidence that was not before the Court at the time of the summary judgment decision, the Court again rejects Hamilton's defense.

Having resolved this threshold issue, it is appropriate to address the merits of the <u>ultra vires</u> defense under Bermuda law. Hamilton's argument essentially turns on a ruling by the Privy Council in related litigation between these parties (the "Privy Council Opinion").  In that litigation, the Privy Council held, in a 3-2 split decision, that the Guarantee in the loan transaction was <u>ultra vires</u>.  According to Hamilton, even though that judgment was limited to the Guarantee, the reasoning applies equally to the Escrow Agreement.

In the Privy Council Opinion, the Privy Council explained that to succeed in establishing that the Guarantee was not <u>ultra vires</u>, MIF needed to

> show that the execution of the guarantee was <u>reasonably incidental to the development agreement</u> or

47

alternatively that the execution of the guarantee was
itself a municipal purpose being a purpose of an
extraordinary nature within section 23(1)(f) of the
1923 Act.

(Emphasis supplied and citation omitted.)   Regarding the term

"reasonably incidental," the Privy Council reasoned:

It is well established that there must be implied into
a statutory provision constituting a public body the
power to do that which is reasonably incidental to any
express power.   In asking whether a power is
reasonably incidental to the exercise of an express
power, it is necessary to examine the express power
that was exercised.   Here the Corporation had power to
dispose of an interest in its land and was thus able
to enter into the development agreement.   It cannot be
said that the guarantee was incidental to the
execution of that agreement.   The development
agreement deliberately distanced the Corporation from
the development.   If the developer did not demonstrate
within a stipulated period that it had obtained the
finance needed to complete the hotel, the Corporation
could terminate the development agreement and the
developer would never be able to complete the
development.   The terms of the agreement specifically
provided that the Corporation and the developer were
not partners for the purpose of the hotel development.

(Emphases supplied and citation omitted.)

The Escrow Agreement was reasonably incidental to the

Development Agreement and was thus intra vires.   As the Privy

Council held, Hamilton "had power to dispose of an interest in

its land and was thus able to enter into the development

agreement."   And, as the Court explained in the Opinion denying

Hamilton's motion for summary judgment, the Escrow Agreement

"obligated Hamilton to review PLV's permanent loan funding

48

documentation, and certify that PLV satisfied the conditions precedent to obtaining proper financing in furtherance of the development." Mex. Infrastructure Fin., 2020 WL 4572679, at *8. These obligations dovetailed with Hamilton's powers under the Development Agreement to oversee the Project.  For example, § 14 of the Development Agreement allowed Hamilton to terminate the Development Agreement if PLV failed to adhere to a set timeline for the Project.  Because the Escrow Agreement required Hamilton to ensure that the Project moved forward as planned, it was reasonably incidental to the Development Agreement and thus not ultra vires.

In addition, several factors indicate that the Escrow Agreement bears a closer resemblance in relevant respects to the Development Agreement than to the Guarantee.  In both the Development Agreement and the Escrow Agreement, Hamilton's role was to oversee the ongoing work on the Project (which, of course, was a development on Bermudan property).  In the Guarantee, by contrast, Hamilton's role was a financial one -- guaranteeing PLV's debt.  Similarly, whereas, in the Guarantee, Hamilton assumed PLV's liability on the Bridge Loan, the Development Agreement and Escrow Agreement created no such liability for Hamilton.  And, while Hamilton's relationship to the Project under both the Development Agreement and the Escrow

49

Agreement was as a landlord, the Guarantee effectively changed Hamilton's relationship to that of a partner of PLV.  Thus, there is no basis to assume that the problems the Privy Council identified with the Guarantee are applicable to the Escrow Agreement.

Hamilton's counterarguments lack merit.  Hamilton argues first that the Escrow Agreement is not incidental to Hamilton's land use powers because it was part of the overall loan transaction and was intimately wound up with the other Loan Documents, including the Credit Agreement.  According to Hamilton, this means that the Escrow Agreement was designed to enable PLV to obtain credit or to protect MIF and thus could not be incidental to Hamilton's power to dispose of interests in land.  But, as the Neuberger Report explains, there "is no reason why a contract cannot be incidental or ancillary to two separate" agreements.  Thus, whether the Escrow Agreement was incidental to the other Loan Documents does not preclude it from being incidental to the Development Agreement.

Hamilton also argues that the term "reasonably incidental" should be construed narrowly to mean that the appropriate test is whether the Escrow Agreement is reasonably incidental to Hamilton's power to dispose of an interest in land, rather than simply incidental to the Development Agreement.  But this view

is difficult to square with language in the Privy Council's opinion expressly stating that the relevant question is whether the agreement at issue "was reasonably incidental to the development agreement." (Emphasis supplied.)

Finally, Hamilton contends that, because § 13 of the Development Agreement was deleted through a Deed of Variation before the Escrow Agreement was executed, the Escrow Agreement cannot be reasonably incidental to the Development Agreement. This argument largely responds to the Court's reasoning in prior Opinions, which referenced § 13 of the Development Agreement. The argument, however, overestimates the importance of § 13.  As noted above, other sections of the Development Agreement, including § 14, empowered Hamilton to terminate the agreement if PLV failed to meet certain benchmarks.  By ensuring that Hamilton remained actively engaged in monitoring the progress of the Project, the Escrow Agreement was reasonably incidental to the Development Agreement, even without § 13.  Thus, the Escrow Agreement was not ultra vires.

ii.  Legislative Approvals

Hamilton also argues that the Escrow Agreement is void ab initio because, unlike other Loan Documents, it was never presented to the Bermuda legislature for approval.  This

argument is based on § 20 of the 1923 Act.  That provision
states in pertinent part:

> (1A)      Any agreement for --
>
>> (a)  the <u>sale of land</u> which is the property of
>> the Corporation; or
>>
>> (b)  a lease, <u>conveyance</u> or other disposition <u>of</u>
>> any interest in <u>land</u> which is the property of the
>> Corporation, being a lease, disposition or
>> conveyance expressed to be <u>for a term exceeding</u>
>> <u>twenty-one years or for terms renewable exceeding</u>
>> <u>in the aggregate twenty-one years</u>,
>
> <u>and any related agreement</u>, must be submitted in draft
> to the Minister for approval by the Cabinet, and be
> approved by the Legislature.
>
> (1B)      If a Corporation purports to enter into an
> agreement referred to in subsection (1A), but the
> agreement was --
>
>> (a)  not submitted in advance to the Minister and
>> approved by the Cabinet; and
>>
>> (b)  not approved by the Legislature,
>
> the agreement, any related agreement, and any sale,
> lease, conveyance or other disposition in pursuance of
> the agreement, shall be <u>void ab initio</u>.

(Emphases supplied.)

Hamilton contends that the Escrow Agreement needed to be
presented to the Bermuda legislature because it was a "related
agreement" to the Development Agreement and to the Mortgage,
each of which, according to Hamilton, the parties needed to
present to the legislature under § 20(1A)(a) or (b).  This
argument fails.

52

First, the Escrow Agreement was not "related" to the
Development Agreement within the meaning of the statute.
Hamilton's legal expert proposes an expansive definition of the
term "related," meaning "connected or having relation to
something else."  But, as MIF's expert explains, this
inappropriately divorces the word from its legislative context.
Obviously, the term cannot be read so broadly as to sweep into
its ambit any agreement that bears any relation to an agreement
falling under § 20(1A)(a) or (b).  Instead, as the Neuberger
Report reasons, it is appropriate to consider the legislative
purpose of the "related agreement" provision, which appears to
be ensuring that the government of Bermuda was fully informed as
to the terms of the conveyance.  Thus, "related agreement" is
better understood as referring to a "side agreement" in a
conveyance, such as a contract adjusting the rent in a lease.
The Escrow Agreement is not a "related agreement" in that sense
and thus was not required to be presented to the legislature.

Hamilton argues that it does not make sense for the Escrow
Agreement to be "incidental" to the Development Agreement for
the purposes of determining if the Escrow Agreement is <u>ultra
vires</u>, but not "related" to the Development Agreement under
§ 20(1A).  This argument is unavailing.  The two terms come from
different strands of Bermuda law, and an agreement can be

"reasonably incidental" to a second agreement under one doctrine
but not "related" to the agreement under a different source of
law.  At trial, MIF presented several compelling illustrations
of agreements that could be incidental to Hamilton's power to
dispose of land, while unrelated to the Development Agreement
for purposes of § 20(1A).  For example, an agreement with a
service provider to paint or landscape the hotel complex on the
Property, several years after the Development Agreement was
executed, would be reasonably incidental to Hamilton's power to
dispose of its own land, but would not be necessary to provide
the legislature with the full context of the terms of the
disposition for purposes of § 20(1A), and therefore, is not
"related to" the agreement that requires legislative approval.

As to the Mortgage, assuming arguendo that it needed to be
presented to the legislature,[14] the Escrow Agreement was not

---

[14] It is questionable whether the Mortgage needed to be presented
to the legislature, anyway.  As the Neuberger Report explains,
under Bermuda law, a mortgage involves a mortgagor conveying
land to a mortgagee, "but on terms that the mortgagor has the
right to have the property reconveyed."  Thus, since § 20(1A)(a)
is limited to agreements for "the sale of land," the Mortgage
cannot fall within the ambit of that subsection.  Further,
although the Mortgage could be considered a "conveyance" within
the meaning of § 20(1A)(b), that subsection is limited to
conveyances "for a term exceeding twenty-one years."  The
conveyance here, however, was intended to last for a defined
period far shorter than twenty-one years.  Moreover, even though
the parties ultimately chose to submit the Mortgage for review,
a representative of the Bermuda government informed them that it
was unnecessary to do so.

related to the Mortgage and thus did not need to be presented. As explained above with respect to the Development Agreement, "related agreement[s]" are those that are necessary to inform the legislature of all the terms of the disposition of land. The Escrow Agreement was not related to the Mortgage in this sense.

### iii. Government Consents

Finally, Hamilton contends in its pretrial brief[15] that the Escrow Agreement is invalid because the parties to the loan transaction did not secure and maintain all necessary governmental consents.  First, Hamilton contends that, after receiving the Section 144 Consent, which laid out the principal terms of the loan, MIF later changed the structuring fee, which rendered the consent void.  But at the outset, it is not clear Section 144 of the Companies Act of 1981 even requires government consent for the Escrow Agreement.  Section 144 provides that "[n]o overseas company without the prior consent of the Minister shall take any <u>mortgage</u> on land in Bermuda." (Emphasis supplied.)  Hamilton offers no authority suggesting that a consent is required for an escrow agreement, as well. Moreover, Hamilton received a copy of the Section 144 Consent in

---

[15] Hamilton did not address this argument at trial in its opening or closing arguments.  The argument is addressed in the interest of completeness.

March 2013 and was on notice of the increased fee in April 29,
2014.  In the Terra Law Opinion finalized a couple of months
later, Hamilton's own legal counsel explained that "[n]o
governmental or public consents . . . are required in connection
with the execution, delivery and performance of each of the Loan
Documents . . . except those that have been duly obtained."
Accordingly, this argument fails.

Second, Hamilton briefly argues that the Escrow Agreement
was invalid because MIF failed to obtain government consents for
the MIF loan participants who helped fund the Bridge Loan.
Again, however, Hamilton offers no legal authority to support
its argument and does not even quote the relevant statutes.  In
addition, contrary to Hamilton's assertions, the loan
participants that helped fund the Bridge Loan were not "co-
lenders," so they did not receive a security interest in any
land in Bermuda.

2.   Contract Defenses

Hamilton's remaining defenses also fail.  Hamilton argues
that MIF has waived its breach of contract claim because it was
aware that Argyle was going to defraud PLV and because it knew
that PLV did not satisfy certain requirements prior to the Final
Drawdown but took no action to protect itself.  Not so.

Under New York law, waiver is defined as the "voluntary and intentional relinquishment of a known right." Cnty. of Dutchess v. Argonaut Ins. Co., 54 N.Y.S.3d 78, 82 (2d Dep't 2017). "[W]aiver of rights under a contract should not be lightly presumed," and thus "a party seeking to demonstrate waiver must put forward evidence of a clear manifestation of intent to waive by the other party." Globecon Grp., LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 176 (2d Cir. 2006) (citation omitted). Hamilton essentially contends that because MIF was suspicious of PLV's proposed funding and did not immediately object to not receiving copies of certain documents from PLV, MIF waived its breach of contract claim. This defense fails. To be sure, MIF was skeptical of the funding arrangement and did not immediately issue a default notice when PLV failed to send it the required copies of the funding documentation. But that is not the "clear manifestation of intent to waive" required under New York law.

Finally, Hamilton argues that MIF cannot sue for breach of contract because it had no contractual right to prevent the Final Drawdown. This argument also fails. As stated in the Escrow Agreement, MIF retained "a security interest in the Escrow Property," and the agreement's stated purpose was "to perfect the Depositor's said security interest in such funds" and to "restrict the disbursement of the escrow until the

satisfaction of certain conditions." Thus, MIF was entitled to expect that the safeguards put in place to protect its security interest would be respected. Hamilton's disregard of those safeguards resulted in damages to MIF, and MIF was entitled to sue Hamilton to recoup those losses.

## II. Breach of Contract Against BNYM

MIF has not carried its burden of showing that BNYM breached the Escrow Agreement. MIF asserts two theories of BNYM's alleged breach -- that BNYM inappropriately disbursed the Final Drawdown (1) even though it had not received "joint written notice" from PLV and Hamilton, and (2) to a personal bank account for MacLean, which could not have served as the "Senior Escrow" identified in the Escrow Agreement. Neither theory prevails.

Before considering these two theories of breach, it is useful to describe the limited though critical role that escrow agents play in commercial transactions. Specifically, under New York law, "an escrow agent has a duty not to deliver the monies in escrow except upon strict compliance with the conditions imposed by the controlling agreement." Parlionas v. Parlionas, 184 N.Y.S.3d 110, 111 (2d Dep't 2023) (citing Farago v. Burke, 262 N.Y. 229, 233 (1933)). An "escrow agent owes the parties to the transaction a fiduciary duty" and therefore has "a strict

obligation to protect the rights of the parties for whom he or she acts as escrowee." Greenapple v. Cap. One, N.A., 939 N.Y.S.2d 351, 352 (1st Dep't 2012) (citation omitted). Based on ordinary principles of contract law, courts in this district have explained that the "[p]arties to an escrow agreement cannot impose upon the escrow agent any obligations in addition to its limited duties under the express terms of its contract." Qube Films Ltd. v. Padell, No. 13-CV-8405 (AJN), 2016 WL 881128, at *4 (S.D.N.Y. Mar. 1, 2016) (citation omitted).

A.  Joint Written Notice

MIF first argues that BNYM breached the Escrow Agreement because it disbursed the Final Drawdown after receiving two separate notices from PLV and Hamilton authorizing the release, rather than a single, jointly executed notice. According to MIF, only a jointly executed notice could meet the requirement of "joint written notice" in the Final Drawdown rules. This theory of breach fails.

As explained above, the Final Drawdown provision required release of funds within three business days after "the Corporation and PLV shall provide joint written notice to" BNYM that the relevant documents were received and approved. Under § 3.3(a) of the Escrow Agreement, the joint written notice needed to come from both Hamilton and PLV and needed to contain

59

two representations: (1) that the relevant documentation had been approved by Hamilton and (2) that the disbursement to a designated Senior Escrow account was authorized.

Late on Friday, October 24, 2014, and within three hours of each other, Hamilton and then PLV each sent BNYM notices that were substantively identical.  They each contained the representations required by § 3.3(a) of the Escrow Agreement. PLV's cover email explained that its notice was "[f]urther to the release notice" sent by Hamilton and was the "require[d] joint notice of release."

On Monday, BNYM advised all parties, including MIF, that it had received the two documents, a notice from PLV and a second notice from Hamilton, and that being "in receipt of the two aforementioned documents" would proceed to release the funds on Wednesday, October 29.  MIF did not object to the release on the ground that there were two separate notices instead of a single document executed by both Hamilton and PLV, or indeed on any ground.  Nor did it ask BNYM to see the notices until December. Additionally, MIF never alerted BNYM that MIF had not received copies, to which it was entitled, of the Senior Escrow Agreement or of PLV's certification that the conditions for a Permanent Loan were satisfied.

On December 11, as it sought loan documentation from PLV, MIF also asked BNYM for copies of the requests, and BNYM promptly provided the copies of both notices.  Again, at that time, MIF made no complaint to BNYM that it had released the funds after receipt of two documents instead of one.  Likewise, when MIF ultimately provided letters of default to PLV and Hamilton on December 15 and 31, the notices did not complain that the disbursement requests were made in two notices, as opposed to one.  In fact, even in the complaint filed in this action, there is no theory of breach articulated based specifically on the receipt of two notices.

The first record of any objection by MIF to BNYM's release of the funds on the ground that there were two notices instead of one appears in MIF's February 28, 2018 memorandum of law in opposition to BNYM's December 15, 2017 motion to dismiss.  By February 2018, the Bermuda Court of Appeal had affirmed the dismissal of MIF's lawsuit against Hamilton, on the ground that Hamilton's execution of the Guarantee had been ultra vires.

Under the Escrow Agreement, BNYM was required to release the funds within three business days of the receipt of the necessary notice.  It had no duties other than those expressly set forth in the Agreement, as the Agreement explicitly recognized; no other duties were "inferred or implied."  It was

also entitled to rely upon and comply with "any" notice from Hamilton and PLV "which it reasonably believes to be genuine." The Escrow Agreement reiterated in another section that BNYM was authorized to "rely upon any notices" that were "believed by it to have been sent or given by" Hamilton or PLV.

MIF has failed to show that BNYM breached the provision of the Escrow Agreement that conditioned release of the funds on "the Corporation and PLV [providing] joint written notice."  For instance, the Agreement did not require the joint notice to be a jointly <u>executed</u> notice.  And the contemporaneous responses by each of the parties, including MIF, to BNYM's notice to them that it was in the receipt of notice in two documents do not suggest that they understood the Escrow Agreement to require a single jointly executed notice.

MIF makes essentially three arguments in support of this prong of its breach of contract claim.  It argues that the Escrow Agreement is ambiguous, that extrinsic evidence supports its present position that the required notice had to be communicated in a single document executed by both Hamilton and PLV, and that a provision relating to BNYM's discretion required it to refrain from releasing the funds.  Its arguments fail to show that BNYM breached the Escrow Agreement.

MIF finds ambiguity in the fact that the Initial Drawdown rules required only "written notice" from Hamilton and PLV.  It argues, therefore, that the insertion of the word "joint" in connection with the Final Drawdown must mean that the notice had to be in a jointly executed single document.

Assuming for purposes of discussion, that this difference in phrasing created an ambiguity, the Escrow Agreement nonetheless gave BNYM the authority to rely on and comply with the parties' representations in the notice.  In any event, BNYM sent an email to MIF and the other interested parties listing the "two" documents that it had received and notifying the parties that it intended to proceed with the disbursement.  No one -- including MIF -- objected to the use of two documents at the time, and therefore BNYM released the funds.  Given BNYM's careful process, MIF has failed to show that the release of the funds by BNYM breached the Escrow Agreement because there were two essentially identical notices instead of one.

In its next argument, MIF seeks to introduce extrinsic evidence of the negotiations of the Escrow Agreement.  These were negotiations in which MIF, PLV, and Hamilton discussed with each other PLV's request to be a joint signatory in connection with the notices to be provided to BNYM.  These were not negotiations in which BNYM participated.  As Escrow Agent, BNYM

allowed the parties to determine for themselves the conditions that would trigger its release of their funds. Thus, these negotiations provide no basis for finding that BNYM had any particular understanding of the word "joint." Indeed, when MIF sent BNYM an updated version of the Escrow Agreement, which added the word "joint," it referred to that addition and other edits as mere "clean-up" edits. And again, BNYM acted with care when it received the two notices, including by advising everyone of the receipt of the two notice documents, and MIF did not object to the release of the funds.

Finally, MIF points to a provision of the Escrow Agreement that granted BNYM certain discretion in the event of ambiguity, to argue that it <u>lacked</u> discretion to disburse the Final Drawdown. The relevant provision reads:

> <u>In the event of any ambiguity</u> or uncertainty hereunder or in any notice, instruction or other communication received by the Escrow Agent hereunder, <u>the Escrow Agent may</u>, in its sole discretion, refrain from taking any action other than <u>retain possession of the Escrow Property</u>, unless and until the Escrow Agent receives written instructions, signed by the Interested Parties, which eliminates such ambiguity or uncertainty.

(Emphases supplied.) MIF contends that this should be interpreted to mean that, while BNYM retained discretion to take or refrain from certain actions in the event of ambiguity, it lacked discretion to release the funds. This is a strained

64

reading of the provision.  The better reading is that BNYM could, in its sole discretion, retain the funds until any ambiguity was resolved.  In any event, MIF has not identified any unresolved ambiguity.  BNYM advised MIF that it had received two notices, and MIF made no objection to the release of the funds on the ground that notification came in two documents rather than one.

B.   Senior Escrow

MIF's second, and its principal, theory of liability against BNYM is based on the Escrow Agreement's direction that BNYM release the funds to the "Senior Escrow."  Both the Hamilton Notice and the PLV Notice identified the Senior Escrow as a bank account in the name of Michael and Yasmin MacLean. According to MIF, disbursing the funds to this account violated the Escrow Agreement because BNYM "could not have reasonably believed" that a personal bank account of PLV's principal and his wife was a "Senior Escrow" account.  This breach of contract theory also fails.

The Escrow Agreement defined Senior Escrow as an account to be established by one of the parties to the Escrow Agreement, specifically by PLV, for purposes of paying expenses associated with the Permanent Loan.  The Hamilton Notice and the PLV Notice both explicitly identified the MacLean account as the "Senior

65

Escrow" account and authorized and directed the disbursement to go to that account.

Under the explicit terms of the Escrow Agreement, BNYM was entitled to rely on and comply with representations made in the notices it received from PLV and Hamilton.  These terms include MIF's irrevocable authorization of BNYM to disburse the funds in accordance with the provisions of the Agreement, as well as the Agreement's authorization for BNYM to "comply with and rely upon any notices, instructions or other communications believed by it to have been sent" by Hamilton and by PLV.  Accordingly, if the parties identified the MacLean account as the Senior Escrow account, BNYM was entitled to rely on the representation and required to transmit the funds within three business days to the identified Senior Escrow.  Importantly, under the agreement, the Senior Escrow agent needed only to be "reasonably acceptable to the Corporation."  The Corporation represented to BNYM that it had approved the Senior Escrow agent.  Thus, whether the designated agent was an advisable choice in MIF's or even BNYM's view was irrelevant to BNYM's obligation to disburse the funds as directed by the only two parties who had the power to authorize the drawdown.

MIF's claim of breach relies on essentially two arguments. Neither succeeds.

66

First, MIF argues that BNYM could not have reasonably believed that the MacLean's account was the Senior Escrow account because it was a personal account and a preexisting account. BNYM was on notice that it was a preexisting account because it had been directed to send the Initial Drawdown to this account on August 14, 2014, and it was aware as late as October 9 that the parties had still not selected the Senior Escrow.[16] MIF argues that Senior Escrow couldn't be a preexisting account since the Escrow Agreement defined the Senior Escrow as "an escrow to be established."

This argument fails for several reasons. Nothing in the Escrow Agreement indicates that the parties charged with identifying a Senior Escrow could not choose a personal account. Nor has MIF pointed to any evidence that the MacLean account was opened before the Escrow Agreement's date of July 9, 2014, much less that BNYM was on notice that it had been opened before that date. Indeed, the Escrow Agreement did not give BNYM a role in the identification of the Senior Escrow and it had no standing to object to the choices made by the others. The Escrow Agreement required copies of the Senior Escrow Agreement to be

---

[16] Until at least October 9, 2014, there were discussions that BNYM might be selected as the Senior Escrow, in which case a new account would have to be opened and a new agreement governing that role would have to be drawn up.

provided to Hamilton by PLV and approved by Hamilton.  It did not require any copy to be provided to BNYM.

Finally, MIF argues that "[l]iteral compliance with the express terms of the Escrow Agreement . . . is not the end of the inquiry."  In fact, however, it is.  The Escrow Agreement expressly states that the "duties, responsibilities and obligations of the Escrow Agent shall be limited to those expressly set forth herein, and no duties, responsibilities or obligations shall be inferred or implied."  MIF cites certain cases for the proposition that when an escrow agent is aware of "actual facts" suggesting that fraud is being perpetrated against a party to the escrow, the agent has a duty to disclose those facts.  See, e.g., Dir. Door Corp. v. Marchese & Sallah, 511 N.Y.S.2d 930, 931 (2d Dep't 1987).  There is no indication that BNYM was on notice that PLV, Hamilton, or MIF was about to be defrauded.  MIF itself did not act until mid-December, close to the termination date of its loan, to gather transaction documents and attempt to learn where its money had gone.  Accordingly, those cases have no application here.

Thus, BNYM is not liable for MIF's losses because it did not breach the Escrow Agreement.  Because there was no breach, it is unnecessary to consider BNYM's remaining defenses.

III. BNYM's Right to Indemnification

BYNM seeks through this trial indemnification jointly and severally from MIF and Hamilton of its attorneys' fees and other expenses incurred in defending against this action.  That application is granted.

Under New York law, where an indemnification provision "does not exclusively or unequivocally refer to claims between the parties themselves," courts "will presume that indemnification [for litigation costs] extends only to third-party disputes." Bank of N.Y. Trust Co., N.A. v. Franklin Advisers, Inc., 726 F.3d 269, 283 (2d Cir. 2013) (citation omitted).  Nonetheless, "[i]ndemnification clauses (like most other contractual provisions) should be read to implement the parties' intentions, to the extent possible." Id.  Thus, when the parties' intent to grant indemnification in certain disputes is "ascertainable from the plain wording of the agreement," awarding indemnification "does not offend the rule that such contracts must be strictly construed to avoid inferring duties that the parties did not intend to create." Id. at 283-84 (citation omitted).

The Escrow Agreement provides:

The Interested Parties [including MIF and Hamilton], jointly and severally, shall be liable for and shall reimburse and indemnify the Escrow Agent and hold the Escrow Agent and its affiliates, and the Escrow

69

Agent's and such affiliates' respective directors,
officers, employees, agents, successors and assigns,
harmless from and against <u>any and all claims</u>, losses,
liabilities, costs, disbursements, damages or expenses
(<u>including reasonable attorneys' fees and expenses and
court costs</u>) (collectively, "Losses") <u>arising from or
in connection with or related to this Escrow Agreement
or being the Escrow Agent hereunder</u> (including but not
limited to Losses incurred by the Escrow Agent in
connection with its successful defense, in whole or in
part, of any <u>claim of gross negligence or willful
misconduct on its part</u>), provided, however, that
nothing contained herein shall require the Escrow
Agent to be indemnified for Losses caused by its gross
negligence or willful misconduct.[17]

(Emphases supplied.)

Although the indemnification provision does not explicitly
refer to litigation between the parties, when read in its
entirety, it does provide for such indemnification.  It refers
to claims arising from BNYM acting as Escrow Agent.  Such claims
would ordinarily be brought by the Interested Parties in the
Escrow Agreement, including depositors like MIF.  Secondly, it
includes a reference to BNYM's defense of claims that it acted
with gross negligence or willful misconduct.  Such claims would
principally be brought only by those who deposited the funds in
escrow or those who expected to receive those funds -- that is,
by the Interested Parties in the agreement.  Accordingly, the
parties intended to indemnify BNYM for litigation costs in

---

[17] The Escrow Agreement contains two, largely duplicative,
indemnification provisions.

disputes involving the parties to the Escrow Agreement.
Moreover, neither MIF nor Hamilton offers any objection to
BNYM's request for attorneys' fees.  Thus, BNYM is entitled to
reasonable attorneys' fees and costs.

### Conclusion

Hamilton breached the Escrow Agreement and is liable to MIF
for the resulting losses that it seeks to recover.  BNYM is not
liable.  MIF and Hamilton are jointly and severally liable for
BNYM's attorneys' fees and costs.  An Order accompanying this
Opinion sets forth a schedule for the further conduct of this
litigation.


Dated:    New York, New York
          July 5, 2023

                                    _____
                                         DENISE COTE
                                    United States District Judge

71